Case No. 18-1337 et al. Independent Producers Group Appellant v. Copyright Royalty Board and Librarian of Congress. Mr. Boydston for the appellant, Mr. Tutar for the appellant. Mr. Boydston, this is Judge Griffith. Good morning. Good morning, Your Honor. You may proceed. Thank you, Your Honor. May it please the Court and the Justices, my name is Brian Boydston and I am the attorney who represents the Appellant Independent Producers Group. As you know from the papers, this matter concerns the distribution of copyright royalties for the years 1999-2000 in the satellite category and 2004-2009 in the cable category. We've described the procedures that we're discussing here in multiple documents, not just in this matter but in previous appeals. But just in short, what this concerns are royalties that are collected by the United States Copyright Office for television programs that are retransmitted. And my client represents numerous producers of television content and makes application for a share of the royalties in each of these royalties pools on an annual basis. The adjudication of who gets what for those pools of royalties is handled by the Copyright Royalty Board, which is the appellee in this matter. The real parties in interest are the Settling Devotional Claimants and the Motion Picture Association, who represent the owners of other television programming who make application for these royalties. The adjudication of this matter concluded a couple years ago after a lot of litigation, appeals, etc. And now, finally, when we had a final ruling on this, it became ripe for appeal. We appeal on three principal grounds. The first two have to do with claims that were denied my client in the initial stages of the proceedings. And then the third basis upon which we appeal is that at the end of the process, the methodologies selected by the Copyright Royalty Board by which distributions from the royalty pools were made were based upon two methodologies which had previously been rejected by the Copyright Royalty Board. And the basis for those rejections were never overcome by the Selling Devotional Claimants and the Motion Picture Association. But our main focus is the two sanctions, essentially, that wiped out vast portions, almost entire portions, of our claims. The first one had to do with the devotional category, which concerns programming which is of a religious nature. In short, the Copyright Royalty Board eviscerated my client's claims in that category because of a failure to produce a single email from 2005, which was not responsive to any discovery request. And yet, the CRB seized upon it as a basis to essentially wipe out $28 million of my client's claims. Why do you say it was not responsive to the discovery request? Well, because the discovery request asked for, you know, it was a very broad request asking for communications regarding, it was just very open-ended. However, in a prior decision or prior ruling, the Copyright Royalty Board had limited the scope of that question to documentation which would go towards perhaps showing that my client did not have authority to pursue specific claims for specific programming. And so that was based upon that prior CRB ruling. That was the manner in which my client responded to that discovery. And the document at issue did not demonstrate, or it was not a document which showed that my client did not have authority to pursue its claim. In the document, a lawyer for two of my client's clients said that my client should, you know, that it was a long rambling email, but the pertinent point of it was, for this purpose, was that my client should quote-unquote expect that there could be a termination of the agreement. It did not say it was terminating the agreement. It said that that could possibly happen. Not that it did happen, but that it could possibly happen. That was it. If I agree with you that the discovery sanction sounds severe, what lesser alternatives did the copyright judges have? I mean, the lesser alternative would have been not to eliminate those claims or to... Well, but if they felt the need to impose some sanctions, what lesser alternatives did they have besides dismissing the claims? Well, they could have, for instance, they could have very easily said, if nothing else, they could have said, we are going to limit how much you can get for those particular claims. For instance, we're talking about... Jason, let me just interject and step back. I mean, the board disputes that this is even a sanction. They talk it in terms of the presumption, and they, you know, their position is that you could have... Judge Fillard, I can't hear you. Oh. Can you hear me now? Yes, much better. I think the board's position was these weren't sanctions. It all had to do with whether the presumption was in effect and that you had opportunities that you did not take on behalf of your clients to reinstate or to, you know, to bolster the reliability of your presentation, and that that's really what was missed on your part. Well, those were two different... Is the presumption in place? That's two different things. The presumption of validity doesn't really have to do with the claims in the devotional category. It has to do with the claims in the programming category. And the presumption of... And so those are apples and oranges, Your Honor. That's the second sanction, if you will. That's the second... And I won't call it a sanction because that confuses things. The sanction was a discovery sanction in the devotional category. I'd like you to go back to my question. What alternative, what lesser alternatives did they have short of dismissing the claim? Well, Your Honor, the answer to that, and I was starting to and I got interrupted, but the answer to that is, for instance, they could have said, okay, we're going to limit it to one of these categories, not all 17. Or they could have said, we're going to, you know, 10% of what you're awarded will be reduced by 10% or something like that. But the other thing that's really important here, Your Honor, is this, is that they wiped out the claims for three different programs, or three different owners of programs. And Kevin Copeland Ministries, Benny Hinn, and Crefro Dollar. If nothing else, if nothing else, they should not have touched the Crefro Dollar claims. Because although Crefro Dollar was mentioned in that email, the attorney who wrote the email, David Joe, didn't even represent Crefro Dollar. He had a financial agreement with Crefro Dollar, but he was not Crefro Dollar's counsel. And therefore, at a very minimum, at a very minimum, they should not have sanctioned Crefro Dollar. That goes to the merits of the question. That doesn't go to whether you should have produced the documents. I know. That is in response to the question as to whether or not, what else could they have done. At the very minimum, what they could have done was not throw out the Crefro Dollar claims. Even then, I think that a more sensible solution would have been to limit them or something like that. But once again, you're right. There's the initial point, which is, was it even responsive? The other thing is, there was zero prejudice here. There was no prejudice that was ever demonstrated for any of this. The attorneys involved actually received the email when it was originally sent. They already had it in their files. They had already introduced it in prior. Why should prejudice matter? We're not in federal district court. Well, Your Honor, we're not in federal district court, but prejudice should matter because of normal, equitable principles. And not only that, but the CRB… The copyright judges made the determination that IPG was acting in bad faith. Now, you disagree with that, but that's the determination they made. And they were trying to sanction IPG for this act of bad faith, which was… There's a history here, right? I mean, they made a determination that there was bad faith, and they were sanctioning you. I disagree. There is not a history, and they never said bad faith. And how could there be bad faith when this was not responsive to the document? It was already in the possession of the other side. Stop for a second. The fact that the document was in the possession of the other side is not relevant at all to the question whether or not you abrogated your obligation under discovery. And as I read your brief, you're really arguing the merits of the document rather than the obligation to turn it over. Well, we're arguing both, but we're certainly arguing the merits of it, yes. And again, the bad faith issue goes to the second question, rather than… Here, this is simply a discovery violation. What is our scope of review here? Well, your scope of review is… I mean, it mixes in with the standard review to a certain extent, but the question is whether or not the Copyright Royalty Board acted arbitrarily or capriciously in the manner in which it issued these rulings. Our contention is it did when these are… Let's just first talk about the discovery question. What is our scope of review? Well, your scope of review is… Don't we have to give great deference to the Copyright Board? You have to give… As Judge Griffiths just said, this is not a case coming from Federal District Court. That is correct, and the standard is alternatively whether or not… Well, I say alternatively. It's whether or not this constitutes an abuse of discretion, and abuse of discretion is generally considered to take place when the rulings are deemed arbitrary or capricious. Our argument is that with regard to each of these points, the Copyright Office acted in a manner which is arbitrary and capricious to deny $28 million worth of… And bear in mind, this money doesn't go to my client directly. My client gets a small percentage of this. Most of this goes to these… Incidentally, with respect to the $28 million, did you ever produce evidence indicating that it was costing you $28 million? Yes, we produced all kinds of evidence in the underlying proceedings. My indication of the brief is you produced a claim, but no evidence. Well, Your Honor, in the proceeding, we produced substantial evidence supporting our claims, thousands of pages of programming, evidence of programming, thousands of pages of documentation on where these various programs were retransmitted, and that's all in the record. That's why the record is so voluminous in the first place. But Mr. Boykin, I think the narrower question is when I was reading that, I had the same question. You don't cite someplace. Like if we were writing an opinion, where would we look to say how much money is at stake? That's not something that I was able to find. Well, Your Honor, to be honest with you, I hate to say the word, but it's just an accurate word to use. It is somewhat buried in the thousands of pages that have been presented to the court. The exact number, to be honest, is relevant only because of the dramatic size and draconian nature of the sanction. The real point is should there have been a sanction or not, but the $28 million figure comes from the fact that what we were dealing with here was a $56 million royalty pool, and there's no dispute that the royalty pool was $56 million. Then the question becomes how much of that would independent producers' groups' clients be entitled to? And the quote-unquote evidence for that is extremely detailed and voluminous because the computation of that depends upon looking at how many hours of programming are at issue and then applying that to the methodology. So you had mentioned prejudice and that this was impermissible because imposed without assuring a prejudice. What's your best case for your argument that prejudice is required prior to the sanction itself? Well, I guess the best argument is that CRB, in other rulings on discovery matters, made rulings saying we're not going to impose a discovery sanction when there is no prejudice. Specifically, the CRB did that when IPG brought a motion for a discovery issue with regard to the Motion Picture Association and the basis upon which the CRB in that circumstance denied the motion because there was, quote-unquote, no prejudice. And we cite that directly in our papers and prominently. So I suppose that's the best case. But there's a very, very close second case, which is looking to the rules of discovery standards under the federal rules. And the fact of the matter is when we don't have a detailed statute or rather regulatory scheme describing the goalposts and the rules for discovery in these proceedings, of course, where is the next best place to look? But there's a very well-developed law that governs federal discovery. Well, this is Judge Silverman. I don't understand that point. We're reviewing an administrative agency and we always have, without even regard to looking at the federal rules, we always afford greater deference to an agency's determination than we do a federal district court where we have a much greater scope of review. Well, nevertheless, Your Honor, I think you would agree with me that it would be, if nothing else, instructive to look. I mean, if there's no other authority, then does this exist in a vacuum? I mean, perhaps it's not controlling authority, but at least I would think it would be persuasive authority. I mean, that's something that happens all the time with legal questions when there's not authority directly on point. Courts will say, all right, there's not something directly on point. There's nothing that controls our conduct here. But we're going to look to other jurisdictions for guidance. I think by the same token, it's surely not outlandish to look to the federal discovery rules and decisions, etc., for guidance on something like this. And when one does look to those sources, there's no question as to what those standards are. And prejudice is an extremely important aspect of that. And I can't think of any logical reason why such a thing should be ignored here. Unless my colleagues have further questions, we'll give you – do you, either Judge Pillard or Judge Silberman, any further questions for Mr. Boynton right now? Boynton right now? Judge Griffith, I'll pass. Okay, we'll give you back a couple minutes on rebuttal, but we'll hear from the government now. He has not yet gone to his second argument, which is the presumption question. Okay, okay. Would you like to address that, Mr. Boynton? I would. Will I still have my three minutes? Yes. All right. I thought you left three. We'll give you time back. Don't worry. Okay. Yes, the second matter is the denial of the presumption of validity, which was imposed based upon the CRB's conclusion that Mr. Raul Galaz had committed perjury in one of the preliminary hearings. And this whole thing was concocted sui sponte by the Copyright Royalty Board after the fact when it made – essentially the CRB went on its own sort of mission to try to make a case. Counsel, I only have one question. The denial of the presumption that you would normally be given permitted you to produce actual evidence of your relationship with the separate companies that you were claiming to represent. Isn't that correct? That's correct, and we did in volumes. We actually went to each individual. Then the point of the denial of the presumption is not really all that relevant. Then the only question is whether the evidence that you produced was adequate. Well, according to the CRB in its decision, it was relevant, and it was controlling. And despite the fact that we introduced evidence from all of the clients confirming that my client represented them, the CRB nevertheless awarded all the claims where there was a dispute to our adversaries because – and cited the fact that there was no presumption of validity. So, Your Honor, yes, but no, because in fact the CRB said we are doing this because the presumption of validity has been denied, ignoring all the evidence that we put in to establish that we did have a valid claim. Okay. Okay, great. We'll hear from the government now. May it please the Court, Martin Tuttaro for the Copyright Royalty Board in the Library of Congress. I would like to interject at this point. I regard the government as the real party of interest in this case, despite the comment made by opposing counsel. Judge Silberman, we are certainly the appellees. I'd like to begin with the presumption of validity. In copyright royalty proceedings, the royalty judges apply a presumption that parties represent who they claim to represent and that the claims they submit are valid. In this case, the royalty judges withheld that presumption from IPG because IPG filed a claim to recover royalties from the 1999 satellite pool on behalf of Tracy Productions. Now, Tracy Productions is a fictitious entity that was previously used by IPG to defraud the Copyright Office. IPG's founder was jailed for that fraud, and based on that conduct, the royalty judges reasonably withdrew the presumption here because the conduct showed that IPG's filing simply could not be trusted. And the royalty judges independently withheld the presumption based on false testimony in these proceedings by the same individual who was jailed because of the Tracy Productions fraud. If I could just make two more points on the presumption. First, the presumption can be rebutted, and it was rebutted by IPG for some of its claims in this case. That's at A4157 and A4181. And the second point is where there were conflicting claims, IPG is incorrect that the board automatically awarded royalties to a different party. Rather, it said, IPG, you did not come up with enough evidence to rebut the presumption to establish that you are, in fact, the rightful receiver of these sorts of royalties. Unless there are any questions on the presumption. Am I right? Let me just ask you, is it Totaro? Yes, Judge Billard. If there's only two claimants for the pool, IPG and SBC, and IPG's claims are dismissed, then does SBC just automatically get everything that would have gone to IPG's claims? Like, it's just basically the whole pool is just given to whoever has valid claims? So, the entire pool of royalties are allocated to different programming categories, and then within those programming categories, they are then divided among claims that are valid. So, the short answer to your question is yes, and the longer answer is I was just trying to give an explanation as to why. Right, and so there isn't a case in which there's some defect in the claims, but they're still determined to not belong to the other claimants, and they were somehow withheld or put to some different use or held over. That's just not part of the system. Right, Judge Billard, and I think that goes to a larger point. The presumption of validity is not just to protect the integrity of the board proceedings. It's also a matter of fairness to the other parties. It protects the other parties who haven't engaged in the sort of behavior that calls into question the validity of their claims. We're talking about a single pot of funds for each category, and when one party receives royalties for dubious claims, it simply harms everyone else seeking royalties from the same pot. And how often, and this is just another contextual question, how often do the judges revoke the presumption? Is it this case, the 2014 ruling, any other? It's like something that you've done in other cases? It's this case. It's the 2014 ruling you mentioned. I'm not aware of it applying to any other party but IPG, and that's because no other party is engaged in this sort of conduct that calls into question the presumption that's, frankly, necessary to make the proceedings run smoothly because of the claims that are filed annually on behalf of tens of thousands of copyright owners. And the legal root or basis of the presumption, the judges came up with it? Judge Pillard, 17 U.S.C. 801C gives the royalty judges the ability to craft procedural or evidentiary rules, and based on that statutory authority, they then came up with the presumption. That, I should add, that IPG doesn't call into question itself. It just merely says that it was improperly withheld in this particular case. Great. Turning to the discovery section, IPG failed to produce a responsive email regarding... Before you do that, shouldn't you also mention, with respect to the presumption, denial of presumption, the false testimony? Yes, Your Honor. Judge Silverman, to be clear here, the copyright royalty judges withheld the presumption for two independent reasons, and so the Tracy Productions point, which was forfeited because IPG never raised it in its opening brief, is sufficient to uphold the royalty judges' withholding of the presumption. But the second and independent reason they withheld the presumption was because of IPG's false testimony about some claims they purportedly filed with the board. Yes, based on the number or the lack of the number at the top of the page. Yes, Your Honor, and I know it can get a little confusing because of the inscription on the top of the page in discovery, but to give the bumper sticker version, here's what had to have happened for IPG's story to be correct. The board would have had to receive a full claim in July 2009 that had no missing pages. Sometime after that, an IPG representative would have had to go to the board and copied its own claim. The board would have then, after that, inscribed 193 on the claim, and that's after the board would have purportedly lost the pages and after IPG copied the claim. And then IPG would have had to decide to turn over in discovery, not the copy of the claim from its own files that supposedly had all the missing pages, but instead produce a copy it got from the board. And we respectfully submit that it was not an abuse of discretion for the royalty judges to reject that fanciful story. Incidentally... ...that they were submitting something incomplete, because it's against their interest to submit something incomplete. Judge Pillard, I think I missed the start of your question. And just to finish your counter, what you called a counterfactual story, when they chose to submit the copy that they got back from the board as opposed to the one in their own files, they would have had to never have checked that it was incomplete, and therefore against their own interest that they were submitting a claim with a big hole in the middle of it. Yes, Your Honor, I couldn't have said it and didn't say it better myself. And the testimony was the testimony of the CEO who had already been indicted, had he already been indicted and convicted or pled guilty at the time he testified? Yes, Judge Silverman. Yes. And that was with respect to the purported representation of Ty D? Yes, Tracy Productions. Unless the judges have any other questions about the presumption of validity, I'll turn to the discovery section, which is reviewed with extreme deference. The royalty judges concluded that IPG failed to disclose a responsive e-mail regarding three copyright holders, Creflo Dollar, Benny Hinn, and Kenneth Copeland. The discovery requests, there are three that are relevant here. First is all documents relating to IPG's right to file petitions to participate. That's a document request that the judges relied on, and IPG did not take on in its opening brief. And so whether the e-mail is responsive to that request is forfeited. But in any event, the 2005 Joe e-mail is plainly responsive to that request because it talks about agreements whose terms have ended and outdated agreements. The e-mail is also responsive to other requests. Could you speak to the severity of the sanction, Mr. Totara? Absolutely, Your Honor. First, there's simply no evidence in the record that the sanction was $28 million. I'd point here not only to the judges' conclusion, but to IPG's opening brief on page 25, where they say, quote, the interveners are correct that no party's evidence associated any particular claimant or programming with a dollar value. There simply is nothing in the record, and it would be entirely speculative. Quite apart from the amount of it, just the fact of dismissal. Weren't there alternatives that were less severe that the copyright judges could have relied upon? Right. It's difficult to think of another alternative, and IPG certainly didn't present any suggestions for lesser sanctions. You heard your friend during his time provide a couple. What do you think of those? Your Honor, in the first instance, I suppose it's something that judges could have considered, but it's not an abuse of discretion to strike a tailored sanction for a violation that relates directly to the parties that are involved in the sanction. The three particular entities mentioned in the 2005 email are the same entities for whom the board struck IPG's right to recover royalties. Judge Griffith, to your point, the royalty judges are presented with limited options when deciding on a sanction. It's not as though they could strike an interrogatory response or a deposition transcript or limit the number of subpoenas IPG could issue, because there are no interrogatories, no depositions, and no subpoenas in board proceedings. Let me ask this question. The three companies that IPG purported to represent and whose claims were struck, it seems to me, may well have a cause of action against IPG. Judge Silberman, the board certainly takes no position on whether those entities do have a cause of action. But it's certainly possible. I would leave that to the three entities. Yes. Judge Griffith, to get back to your point, I also just want to make clear why discovery is so important in board proceedings. Discovery, more so than even in district court litigation, it tends to go to the core issue of a party's ability to obtain royalties for a claim. Because there are no interrogatories, there's no depositions, there's no subpoenas, it's really important for a party to comply fully with document production. And if you don't do so, there are very limited ways for your adversary to know if you're not adequately engaging in discovery. And so IPG's conduct, not only did they fail to turn over a responsive document, but when questioned about IPG's violation, the witness didn't say that he went back through our records to find this or any other document responsive to the request. He didn't say that the responsive email slipped through the cracks, but IPG has put in place measures so that it wouldn't happen again. Instead, he testified that he, quote, had no idea whether IPG had the email from Mr. Joe in its records and that he, quote, didn't go back and look for it even after settling devotional claimants' move for sanctions. Okay. Okay, any further questions from my colleagues? No. Okay, thank you. Mr. Boykspoon, we'll give you two minutes for rebuttal. Thank you, Your Honors. Thank you, Mr. Turner. Thank you, Your Honor. To begin with, with regard to Tracy Productions, thank you, that was addressed in the opening brief beginning at page 43 of the opening brief. I'm not sure why counsel says it was forfeited, but we did address that in the opening brief. And the fact of the matter is that, yes, Tracy Productions was in an initial placeholding filing. However, what's more significant is that when these proceedings began, one of the first things that happens is that you have to file petitions to participate. And in those petitions to participate, Tracy Productions was never included, not once, not ever, which had the effect of meaning that they could never possibly have any kind of a claim. Weren't you obliged to withdraw those claims? No, there's no regulation or statute that says you have to withdraw it. In fact, what they say is when you make an initial claim on an annual basis in July, all that does is hold your place momentarily. If you do not file a petition to participate once the proceeding begins, then it's eliminated. It is void. It is forfeit. Because it's forfeit, if there's no petition, if it's not included in a petition, it's forfeit. It's done. It's the same exact thing. There's no procedure for withdrawing it. The way you withdraw it is you don't include a claim in the petition to participate, which IPG never did for Tracy Productions. So the predicate for the position is void. So with regard to the presumption of validity, or excuse me, with regard to the discovery sanction, again, there was only one request for production of documents that this was responsive to. It was only after IPG filed motions for reconsideration that the CRB then changed its mind and said, oh, there are these other requests as well. However, as we went through in close detail in the briefs, this email was not responsive to any of these things. Again, it was that most of this email was saying there might be a termination. At no point in the email does it say there is a termination. Because of that, it was never, ever responsive. Thank you. Do my colleagues have any questions for Mr. Boyston? No. Okay. Thank you very much. The case is submitted. Thank you, Your Honor. I want to thank both Mr. Boyston and Mr. Tartara for being patient with us as we all struggle with this less than perfect way of hearing argument, but we're grateful that we can do this and thankful for your participation and hope that you will be safe. As I said, the case is submitted.
judges: Griffith, Pillard, Silberman